# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARGARET D. FOX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:03-0082** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 4. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 8.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

## I. INTRODUCTION

Plaintiff filed her applications for DIB and SSI on June 30, 1995, alleging that she had been disabled since June 8, 1994, due to "back, carpal tunnel, feet, headaches, [and] nerves." *See, e.g.,* Docket Entry No. 2, Attachment ("TR"), TR 25-28; 58-61; 86. Plaintiff's applications were denied both initially (TR 41-42; 66) and upon reconsideration (TR 56-57; 68-69). Plaintiff subsequently requested (TR 70-71) and received (TR 23) a hearing. Plaintiff's hearing was conducted on August 27, 1996, by Administrative Law Judge ("ALJ") John P. Garner. TR 385-427. Plaintiff, Plaintiff's husband, Kenneth Fox, and vocational expert ("VE"), Rebecca Williams, appeared and testified. TR 385-427.

On January 4, 1997, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 273-286. Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Social Security Act on June 8, 1994, the alleged disability onset date, and continued to meet them at least through June 31, 1999.

2. The claimant has not engaged in substantial activity since the alleged disability onset date.

3. The medical evidence establishes that the claimant has carpal tunnel syndrome, lower back pain and disc bulge, which are "severe" impairments, but she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are disproportionate to the medical evidence and are not fully credible, considering both medical and "other" evidence. 20 CFR 404.1529 / 416.929.

2

5. The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of sedentary, light or medium work. 20 CFR 404.1545 and 416.945.

6. The claimant is able to perform her past relevant work as a fast food worker or nurse's aide.

7. The claimant is 43 years old, which is defined as a younger individual. 20 CFR 404.1563 and 416.963.

8. The claimant has a high school education. 20 CFR 404.1564 and 416.964.

9. The claimant does not have any acquired work skills, that are transferrable to the skilled or semi-skilled work functions of other work. 20 CFR 404.1568 and 416.968.

10. Based on an exertional capacity for sedentary work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16, and Rule 201.27, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4; and Rule 202.20, Table No. 2 of Appendix 2, Subpart P, Regulations No. 4; and Rule 203.28, Table No. 3 of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11. Even if the claimant could not perform her past relevant work, using the above-cited rule(s) as a framework for decisionmaking, there are a significant number of jobs in the national economy which the claimant could perform. Examples of such jobs are: as a cashier (10,000 jobs locally), receptionist (3,500 jobs locally) or a teacher's aide (600 jobs locally).. [*sic*]

12. The claimant was not under a "disability," as defined in the Social Security Act and Regulations, at any time through the date of this decision. 20 CFR 404.1520 (f) and 416.920 (f).

TR 284-286.

Plaintiff then sought review from the Appeals Council, which vacated the ALJ's decision

and remanded the case for another hearing on February 16, 1999. TR 312. Plaintiff's second

hearing was conducted on September 7, 1999, by ALJ Garner. TR 428-448. Plaintiff and VE,

Rebecca Williams, appeared and testified. TR 430-447.

On November 10, 1999, the ALJ again issued a decision unfavorable to Plaintiff, finding

that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.

TR 459. Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Social Security Act on June 8, 1994, her alleged onset dated [*sic*] disability and continued to meet them through June 30, 1999, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since her alleged onset date of disability.

3. The claimant has "severe" degenerative disc disease of the lumbar spine and generalized depression, but she has not had an impairment or combination or [*sic*] impairments listed in, or medically equal to one listed in, 20 CFR Part 404, Subpart P, Appendix 1.

4. The claimant's subjective complaints (including those of pain) were not fully credible and her limitations have not been as severe as alleged.

5. Prior to 1999, the claimant was able to perform sedentary work; since January 1999, the claimant has been able to perform light work involving lifting and carry [*sic*] up to 10 pounds.

   Throughout the period relevant to this decision, she has been no more than moderately limited in her ability to interact socially and only slightly limited in her ability to maintain concentration, persistence or pace.

6. The claimant is unable to perform her past relevant work as a fast food worker and nurses aide.

7. The claimant is 46 years old, a younger individual.

4

8.　　The claimant has a high school education.

9.　　The claimant does not have any acquired work skills that are transferrable to the skilled or semiskilled work functions of other work.

10.　　Based on an exertional capacity for sedentary work and the claimant's age, education and work experience prior to 1999, Rules 201.21 and 201.27 would direct a finding of "not disabled."

11.　　Based on an exertional capacity for light work since January 1999 and the claimant's age, education and work experience, Rule 202.20 of 20 CFR Part 404, Subpart P, Appendix 2 would direct a conclusion of "not disabled."

12.　　Using the above cited rules as a framework for decisionmaking, there have been, throughout the relevant period, a significant number of jobs in the economy which the claimant could have performed. Examples of such jobs are (at the sedentary level) bookkeeper, assembler, inspector and general laborer and (at the light exertional level) machine operator, assembler, inspector and janitor/cleaner.

13.　　The claimant was not under a "disability," as defined in the Social Security Act and Regulations, at any time through the date of this decision.

TR 16-17.

On November 15, 1999, Plaintiff again sought review from the Appeals Council. TR 7; 521. On September 28, 2000, the Appeals Council issued a letter declining to review the case. TR 5-6; 522-523. Plaintiff then filed suit in the United States District Court for the Middle District of Tennessee. TR 459. The district judge vacated the Commissioner's decision and remanded the case for another hearing. *Id.* On July 9, 2002, the Appeals Council ordered a third hearing (TR 524-525), which was conducted on February 6, 2003, by ALJ Mack H. Cherry (TR 475-501). Plaintiff and VE, Dr. Kenneth Anchor, appeared and testified. TR 478-501.

5

On April 19, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 459-468. Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Act on June 8, 1994, her alleged disability onset date, and continued to meet them through June 30, 1999.

2. The claimant has not engaged in substantial gainful activity since June 8, 1994.

3. The claimant's "severe" impairments are lumbar degenerative disc disease, a chronic pain syndrome, and an anxiety disorder (not otherwise specified), but she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. As discussed above, the claimant's testimony could not be found fully credible.

5. The claimant can perform the residual functional capacity described above. 20 CFR §§404.1545 and 416.945.

6. The claimant's past relevant work as a salad bar attendant could be performed with the above limitations per the vocational expert's testimony. 20 CFR §§404.1565 and 416.965.

7. The claimant's impairments do not prevent her from performing her past relevant work.

8. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision. 20 CFR §§404.1520(e) and 416.920(e).

TR 467-468.

On April 22, 2003, Plaintiff timely filed a request for review of the hearing decision. TR 452. On August 6, 2003, the Appeals Council issued a letter declining to review the case (TR

449-451), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Evidence in the 1996 Hearing

Plaintiff alleges disability due to "back, carpal tunnel, feet, headaches, [and] nerves." TR 86.

### 1. Medical Evidence: Physical

On August 5, 1989, Plaintiff sought emergency room treatment at Cookeville General Hospital ("Cookeville") for a "bad headache." TR 145.

Plaintiff underwent x-rays at the request of Dr. James W. Shaw on January 18, 1990, for a mass in her right elbow, the results of which were "normal." TR 146.

On September 12, 1990, Plaintiff again sought emergency room treatment at Cookeville after she fell over boxes at work. TR 147-148. Dr. Sullivan K. Smith ordered x-rays of Plaintiff's lumbar spine, sacrum, and coccyx, which revealed no "destructive practices or congenital anomalies...no fractures, dislocations, or other bone or joint abnormalities." TR 147-149.

From December 14, 1992 through January 20, 1994, Dr. Douglas Dycus treated Plaintiff for arm pain. *See* TR 189-194. On December 14, 1992, after examining Plaintiff's arm, Dr. Dycus suggested that Plaintiff wear a wrist splint, rest her left arm, apply heat, massage the

affected area, and only engage in "light work activities."[1]  TR 189.  Plaintiff returned to Dr.

Dycus on January 11, 1993.  TR 190.  Dr. Dycus noted that "work still aggravates pain in Lt arm

– on light activities at work."  *Id.*  Dr. Dycus's "plan" was for Plaintiff to "[c]ontinue NSAID"

and "avoid current activity."  *Id.*  On May 20, 1993, Dr. Dycus noted: "[Plaintiff's] tendinitis

aggravated again – worsening."  TR 191.  He further noted that Plaintiff had a "numb feeling in

lateral bicep."  *Id.*  On June 3, 1993, Plaintiff returned to Dr. Dycus, who noted: "[Plaintiff's]

brace/splint not helping – numbness episodic w/ tingling."  TR 192.  Dr. Dycus also noted that

Plaintiff's condition was "slightly, worse now."  *Id.*  Also on June 3, 1993, Dr. Dycus referred

Plaintiff to Drs. Paul A. Abbey and Stephen Pratt.  TR 118; 192.

On June 9, 1993, Dr. Abbey examined Plaintiff for complaints of discomfort in her left

arm, loss of grip, and tingling.  TR 118.  Dr. Abbey conducted an examination of Plaintiff's left

extremity and noted "tenderness in the lateral epicondylar area ... in the supinator and extensor

wad proximally ... [and] at the top of her wrist."  TR 119.  During examination, Dr. Abbey also

noted that "[e]lbow flexion... provoked some discomfort."  *Id.*  Plaintiff was diagnosed with

"tennis elbow, left carpal tunnel syndrome and diffuse tendinitis," and Dr. Abbey noted that

Plaintiff might need "therapy to help improve things."[2]  TR 119.

On July 14, 1993, Plaintiff returned to Dr. Abbey, reporting problems with her

"paresthesias" and "tennis elbow."  TR 120.  Upon examination, Dr. Abbey noted that Plaintiff

was "tender in the lateral epicondylar area...[had] a positive Tinel's, positive Phalen's and

---

[1] Parts of Dr. Dycus's medical records are illegible.  TR 189-194.

[2] It appears that, between Plaintiff's appointment on June 9, 1993 and July 14, 1993, Dr. Abbey placed Plaintiff on "therapy."  TR 120.  Dr. Abbey did not affirmatively note or describe this treatment.  *Id.*

8

positive reverse Phalen's with particular discomfort in that area." *Id.* After examination, Dr. Abbey treated Plaintiff with an injection.[3] *Id.* Dr. Abbey stopped Plaintiff's "therapy," in addition to ordering an "EMG and nerve conduction study test of her left upper extremity." *Id.* Plaintiff's EMG suggested "left mild carpal tunnel syndrome."[4] TR 124.

On July 14, 1993, Dr. Abbey completed a "Work Status" form, which indicated that Plaintiff could return to work on "light duty." TR 121. Dr. Abbey also noted that Plaintiff's diagnosis included "[left] tennis elbow, [left] CTS, [and] tendonitis." *Id.* Dr. Abbey reported that Plaintiff could occasionally lift and carry up to 10 pounds, and noted that Plaintiff should not expose herself to "repetitive motion [or] grabbing." *Id.*

Ms. Melissa Cooper Lamb, a physical therapist with Sports Medicine & Therapy Center, first administered physical therapy on Plaintiff on August 5, 1993. TR 172. Ms. Lamb noted that Plaintiff showed "no improvement...[and a] lack of progress." *Id.*

On December 14, 1993, Plaintiff sought emergency room treatment for headache, vomiting, diarrhea, and difficulty breathing. TR 161-163.

On January 20, 1994, Dr. Dycus found a "nodular mass" on Plaintiff's right arm, and referred her to Dr. Carl M. Hollmann, an orthopedic surgeon. TR 141; 460. During Plaintiff's visit with Dr. Hollmann on January 21, 1994, she complained of "diffuse pain...over the medial and lateral epicondylar areas." TR 141. Dr. Hollmann noted the formation of a bump in the supracondylar region of the elbow. *Id.* Dr. Hollmann performed an x-ray, which revealed an

---

[3] The record does not specify the type or location of the injection.

[4] The date of the testing is illegible.

9

osteophyte in the supracondylar region.[5]  *Id.*  Dr. Hollmann noted that he "doubted that the osteophyte was the source of her problem...[and that] basically what she ha[d] [was] an overuse syndrome."  *Id.*  Dr. Hollmann, therefore, did not recommend surgery.  *Id.*  On February 18, 1994, Plaintiff returned to Dr. Hollmann, who surgically removed the osteophyte on February 22, 1994.  *Id.*; 166-170.

On June 10, 1994, Plaintiff returned to Dr. Dycus with complaints of back pain after she had fallen at work.  TR 195.  Upon physical examination, Dr. Dycus found that Plaintiff had injured her left lower spine area and left gluteal.  *Id.*  Dr. Dycus prescribed medication, 5 days of bed rest, and physical therapy.  *Id.*

In a report dated June 17, 1994, Ms. Lamb stated that Plaintiff "present[ed] with poor posture, muscle point tenderness in the paraspinal musculature and left PSIS and gluteal region." TR 173-174.  Ms. Lamb further noted that "[n]o neurological symptoms were noted...[and] strength [was] decreased in the lumbar area as well."  TR 174.

On July 24, 1994, Ms. Lamb reported that after 1 month of treatment, Plaintiff was "improving slowly with regard to back symptoms."[6]  TR 174.  On August 3, 1994, Ms. Lamb noted that she had been unable to "reduce [Plaintiff's] symptoms" since July 8, 1994.  TR 176. Ms. Lamb also detailed Plaintiff's additional complaints of foot, knee, and neck pain.  *Id.*  At the request of Dr. Dycus, Plaintiff underwent a lumbar spine MRI on August 9, 1994, because of numbness in her legs.  TR 171; 198.  Plaintiff's MRI revealed:

---

[5] Dr. Hollmann also referred to the osteophyte as a "hook of bone" and a "bone spur." TR 141.

[6] The date on the note written by Ms. Lamb (TR 174) states "1993," but, the correct date is 1994.

10

> Vertebral body heights and disc spaces are well maintained with
> normal alignment. There is a mild bulging disc present at the L4-5
> and L5 S1. There is no evidence of disc herniation or spinal
> stenosis. There is no evidence of nerve root compression. The
> conus is normal.

TR 171. On September 15, 1994, Ms. Lamb noted to Dr. Dycus that Plaintiff was "progressing

well on her treatment program with little complaints...until she fell down the stairs." TR 177.

On September 19, 1994, Plaintiff returned to Dr. Dycus after a fall which occurred at her

home on September 10, 1994. TR 199. Upon examination, Dr. Dycus found that the pain in

Plaintiff's "lower back [had been] subjectively improving[,] [however,] after [her] fall...it is back

to [the] level of severity prior to [her] visit." *Id.* Dr. Dycus recommended that Plaintiff abstain

from "prolonged standing or bending." *Id.* On February 21, 1995, Plaintiff again returned to Dr.

Dycus, complaining of pain in her lower back in addition to "migraine[s]...nausea [and]

throbbing [twice] per month." TR 201. Dr. Dycus prescribed Plaintiff Soma, as well as other

medications.[7] *Id.*

On February 23, 1995, Plaintiff met with Dr. Dycus to watch an informational video

concerning the use of Imitrex, which Dr. Dycus subsequently prescribed. TR 202. During

Plaintiff's March 21, 1995 appointment with Dr. Dycus, she reported that the "Imitrex [was]

working extremely well." TR 203. Dr. Dycus referred Plaintiff to a neurosurgeon, Dr. Everett

Howell, Jr. TR 203; 210.

On April 10, 1995, Dr. Howell examined Plaintiff for complaints of back pain. TR 210-

211. Plaintiff brought "an MRI scan dated 08/09/94, and a report from Melissa Lamb at Sports

Medicine and Therapy Center of Cookeville, Tennessee." TR 211. Dr. Howell reviewed

---

[7] The medications are illegible. TR 201.

11

Plaintiff's MRI scan and noted "a minor disc bulge at L4 and L5," but concluded that there was no "evident nerve root compression." *Id.* Dr. Howell recommended that Plaintiff see Mr. Fred Brown "for an evaluation of a physical therapy program." *Id.*

At the request of Dr. Dycus, Plaintiff again visited Dr. Howell on July 31, 1995, after she experienced further "back pain with radiation of pain down the right leg ... occasional left leg pain ... [and] pain radiating up her shoulder into her neck." TR 212-213. Dr. Howell noted that "[s]he has been on medications but none have offered any benefit." TR 213. Dr. Howell scheduled another MRI, in addition to a full Functional Capacities Evaluation. *Id.*

On August 3, 1995, Dr. Howell completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" form. TR 208-209. Dr. Howell noted that Plaintiff could occasionally and frequently lift a maximum of 10 pounds, could stand and/or walk for a total of at least 2 hours in an 8-hour workday, and could sit for a total of 6 hours in an 8-hour workday. *Id.*

On August 15, 1995, Dr. William Clark completed a Residual Physical Functional Capacity Assessment ("RFC") for Plaintiff. TR 33-40. Dr. Clark opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of 6 hours in an 8-hour workday, and sit for a total of 6 hours in an 8-hour workday.[8] TR 34. Dr. Clark also noted that Plaintiff had an unlimited ability to push and/or pull, and that Plaintiff was limited in her upper extremities. *Id.* Dr. Clark further opined that Plaintiff frequently had postural limitations, that she had unlimited reaching and feeling capabilities, and that she had limited handling and fingering abilities. TR 36. Dr. Clark also

---

[8] Dr. Clark's handwritten notes are virtually illegible. TR 34.

indicated that Plaintiff had no visual, communicative, or environmental limitations.  TR 36-37.

On September 27, 1995, Dr. Helena P. Perry completed an RFC for Plaintiff.  TR 48-55.
Dr. Perry opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift
and/or carry 25 pounds, stand and/or walk for a total of 6 hours in an 8-hour workday, and sit for
a total of 6 hours in an 8-hour workday.  TR 49.  Dr. Perry further opined that Plaintiff was
limited in her ability to push and/or pull.[9]  *Id.*  Dr. Perry noted that Plaintiff frequently had
postural limitations, and that Plaintiff had limited handling and fingering abilities.  TR 50-51.
Dr. Perry also noted that Plaintiff had no visual, communicative, or environmental limitations.
TR 51-52.

On September 28, 1995, a vocational specialist completed a "Vocational Specialist
Comments" form, and noted that Plaintiff had the residual functional capacity for "[m]oderate
work [and] frequent [] [h]andling, fingering."[10]  TR 46-47.  The vocational specialist opined that
Plaintiff was able to return to her past work as a "nurse['s] assistant" and "production-machine
tender."  TR 46.

**2.  Medical Evidence: Mental**

At the request of Plaintiff's attorney, Dr. Rohr conducted a psychological examination of
Plaintiff on October 10, 1995, to aid in her application for disability benefits.  TR 214-220.  Dr.
Rohr conducted an Interview and Observation, and administered the Wechsler Adult Intelligence
Test-3rd. Ed., Wide Range Achievement Test-3rd. Ed., Bender Visual Motor Gestalt Test, Beck

---

[9] Dr. Clark's handwritten notes concerning Plaintiff's exertional limitations are illegible.
TR 49.

[10] The name of the vocational specialist is illegible.  TR 47.

Depression Inventory, and Rorschach Ink Blot Test.  *Id.*  Dr. Rohr noted as follows:

> [Plaintiff is] functioning in the borderline range.  Clients achieving in this range are capable of self sufficiency in terms of personal, social and vocational adequacy.  When under stress they need guidance.  This lady, as far as vocation, seemed to function well until she began to have a series of physical problems.  She presented symptoms of chronic pain patients.  She seems to meet criteria for depressive disorder.  She has crying spells, loss of interest, self depreciation, eating and sleeping irregularities, etc.  She is avoiding people.  She has not been treated psychiatrically.  She is easily distracted and has trouble concentrating.  She complained about not thinking well.  She does appear capable of simple manual labor within the parameters of physical conditions.  However, her depression would make it difficult for her to sustain concentration and persistence.  She would also have some difficulty dealing with people as she wishes to avoid them.  She also seems to be somewhat confrontational in relationships.

TR  219-220.  Regarding Plaintiff's daily physical activities, Dr. Rohr reported:

> Ms. Fox resides with her husband and oldest daughter.  She is up by approximately 11 AM and in bed at 5:00 or 5:30 AM [*sic*].  She is up and down piddling.  She has little appetite and does not feel like eating.  She has to have something to eat or she will get a headache and the headache will become a migraine.  She has some difficulty with housework.  She cannot clean the bathtub or do heavy work.  When she tries to vacuum it hurts.  She has a pushing problem.  She will stand and do a few dishes and will have to sit.  Her husband will finish them.
> Ms. Fox gets dressed if she has too [*sic*].  She does shower everyday [*sic*].  During the day she sits and stares at the wall a lot.  She can't read and get anything out of the materials.  TV makes her nervous and she turns it off.
> Ms. Fox goes shopping when she has too.  She will go and then turn around and go home.  She forgets half of what she goes to get.  She gets perplexed and goes home.  Her husband will have to go back and finish the shopping.  Sometimes her daughter does it.

TR 217.

On December 4, 1995, Mr. Norman E. Hankins, a licensed psychologist, completed a

14

Vocational Evaluation Report at the request of Plaintiff's attorney. TR 224-226. Mr. Hankins

performed a Wechsler Adult Intelligence Scale (Revised) assessment, in addition to a Wide

Range Achievement Test (Revised). TR 225-226. Mr. Hankins opined that:

> Should it be determined by the Administrative Law Judge that Ms.
> Fox is physically limited as indicated by Dr. Howell and that she is
> further limited by her depression as indicated by Dr. Rohr, I do not
> believe that there are any jobs which she can perform. With those
> restrictions, I do not believe that she can meet the demands of
> gainful employment. Therefore, I believe that she is under a
> vocational disability of 100%.

TR 226.

On July 12, 1996, Dr. Dycus completed a "Clinical Assessment of Ability to do Work-

Related Activities (Mental)" form for Plaintiff. TR 260-262. Dr. Dycus concluded that Plaintiff

had a limited ability to understand and remember, a limited ability to sustain concentration and

persistence, and limited social interaction. TR 260-261. Dr. Dycus noted that Plaintiff's ability

to adapt was not significantly limited. *Id.* Dr. Dycus elaborated on Plaintiff's social interaction,

stating:

> Patient currently suffering from emotional lability and agitation
> due to underlying depression[,] a response to criticism even
> constructively or correction would likely result in or evoke a
> response of hostility/agitation or lability + crying.

TR 261.

Commenting on Plaintiff's overall mental condition, Dr. Dycus added:

> Patient also possesses a mild degree of anhedonia which affects
> initiative and independent activity that is self-motivating in nature.
> This as well as other symptoms and impairments listed above are
> mild in severity. They were severe to moderate in severity in May
> of this year but seem to be improving on an altered regimen of
> anti-depressants. Her last medicine adjustment was made on
> 7/12/96 and is to be re-evaluated in terms of efficacy on 8/23/96.

15

TR 261.  Dr. Dycus noted that Plaintiff had "slight" restrictions of activities of daily living, and "moderate" difficulties in maintaining social functioning, but "seldom" had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and had "repeated" episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw.  TR 262.

### 3.  Plaintiff's Testimony on August 27, 1996

Plaintiff was born on April 18, 1953, and has obtained her GED.  TR 389-390.  She has worked as a nurse's aide, waitress, factory worker, and has held "different odd jobs."  TR 390.

Plaintiff testified that, prior to 1986, she had worked at Master's Healthcare and Office as a nurse's aide.  TR 391.  Plaintiff stated that she lifted patients out of their beds and into wheelchairs with the help of another aide.  *Id.*  Plaintiff reported that her duties had also included bathing, feeding, cleaning, and putting the patients back into bed.  *Id.*  Plaintiff stated that the job had required her to remain physically fit and mentally alert.  *Id.*  She stated that the position had also required her to reach, stoop, bend, and manipulate objects with her fingers and hands.  *Id.*

Plaintiff testified that, starting in 1986, she had worked at Nielson's in Gainesboro putting sample picture frame corners together, and later had worked with heavy machines.  TR 390-391.  She stated that the position had also required her to reach, stoop, bend, and manipulate objects with her fingers and hands.  TR 391.  Plaintiff testified that she had been "fired" from Nielson's "on a personal basis," in 1989.[11]  TR 391-392.

Plaintiff stated that, after working at Nielson's, she had worked at Wendy's for 8 months

_____

[11] When asked if her departure from Nielson's was "related to the fact that [she] couldn't work and couldn't do the job," Plaintiff replied, "no."  TR 392.

until she fractured her tail bone. TR 392. Plaintiff reported that a fall at work had caused her injury; however, she stated that she had continued to perform her job functions. TR 392-393. Plaintiff stated that she cleaned the dining room and did "various odd things... whenever needed." TR 393. Plaintiff testified that she had also worked as a "drive-thru" attendant, but requested other duties because she was uncomfortable working with money. *Id.* Plaintiff testified that she quit her job at Wendy's because she could not live on the "three hours every other day" that she would work. *Id.*

Plaintiff reported that, in 1991, she had worked various jobs for At Work Personnel, including a temporary position at Sparta Woods. TR 393-394. During her time at Sparta Woods, Plaintiff testified that her job had required her to be alert because "there [were] constantly forklifts and stuff coming around and bringing boxes over to where you worked..." TR 394. Plaintiff additionally reported that she "had to bend over, [and] pick the boxes up," as well as climb up onto pallets to retrieve boxes. TR 395.

Plaintiff testified that, after At Work Personnel, she "remarried and went on the road with [her] husband." TR 395. Plaintiff stated that she was not paid for riding in her husband's truck. *Id.* Plaintiff testified that, after riding with her husband, she had gone to work at Crotty as an edge folder on an electric glue sewing machine. TR 396. Plaintiff reported that she had recovered from her fractured tail bone when she began working at Crotty, but continued to experience pain when sitting for long periods of time. TR 396-397. Plaintiff stated that at Crotty, she developed carpal tunnel in her arm from the "repetitive motion of holding onto these things and pushing them to a hard glue sewing machine." TR 396.

Plaintiff stated that Crotty sent her to Drs. Abbey and Pratt, who diagnosed her with

17

carpal tunnel syndrome. TR 397. Plaintiff testified that Crotty moved her to a different job cleaning glue residue off visors "where it didn't exert the pressures on my left arm." TR 398. Plaintiff then testified that Crotty moved her to a "tucker" position where she would "take a pair of nipper scissors and...press real hard and tuck in the corner of the visor." *Id.* Plaintiff testified that, after tucking, she developed a bone spur on her right arm which needed surgery. *Id.*

Plaintiff testified that her carpal tunnel syndrome was unresolved. TR 399. Concerning her left arm, Plaintiff stated:

> [I]t's hard to pick up anything, small objects. I don't have much
> feeling in my fingertips. I would pick them up and...lose them.
> Heavy objects, I don't pick up heavy objects. Like a gallon of
> milk, I pick up with my right hand because I've got more strength
> in it than I do my left.

*Id.* Plaintiff further testified that she had experienced pain and numbness during "fine manipulation." *Id.* Plaintiff stated that she had developed pain in her right arm, and had difficulty lifting objects. TR 400. Plaintiff stated that she could "lift smaller things, you know, a frying pan, [and] a skillet," however, a gallon of milk was "kind of iffy, but I pick it up and then...it's painful." *Id.*

Plaintiff testified that she had injured her back at Crotty when a "fellow employee handed [her] a 75 pound box of parts, jokingly, after [she] had just come back from having surgery." TR 400. Plaintiff stated that Dr. Dycus referred her to "Dr. Hal," who scheduled an MRI and discussed possible surgery.[12] TR 401. Plaintiff testified that she had returned to work at Crotty "on a very light job of cleaning," but that the cleaning solvent caused her breathing problems and "super size" headaches. *Id.*

---

[12] "Dr. Hal" apparently is a phonetic spelling of Dr. Howell.

18

When asked why she was unable to return to her previous work or "find some employment that [she] could do to earn a living[] on a regular basis," Plaintiff answered that she had been "taking too much medicine and...would of [*sic*] ended up hurting [her]self." TR 402. Plaintiff further explained that her mental problems had prevented her from finding a job because she could not "stand being around people." TR 403. Plaintiff stated that she was "nervous," "irritable," and would "break out crying constantly." *Id.*

Plaintiff testified that she took "Ambien" to help her rest at night, "Trazodone and Serzone" for nerves, "Hyoscyamine" for spastic colon, "Imitrex" and "Simitriptin" to treat migraines, and "Ercal" to prevent migraines. TR 404-405. Plaintiff stated that "Imitrex" and "Ercal" caused her nausea for 30 minutes, and then drowsiness for 45 minutes. TR 406. Plaintiff testified that a "certain sick feeling in [her] stomach" indicated that a migraine was coming. TR 406. Plaintiff further testified that her head would "throb" in between her eyes, and that she experienced eye irritation from "bright lights." *Id.*

Plaintiff testified that she would get lightheaded, dizzy, and tired after taking her medication. TR 409. Plaintiff added that after taking "some of the medicines," she would often have fainting spells; however, she was not sure which medications were the cause. TR 411. Plaintiff also added that 30 minutes after she would take her medication, she would have a dry mouth, would occasionally throw up, and would suffer from diarrhea. TR 409. Plaintiff testified that her medicines impaired her alertness. TR 410. She further testified that she took medicine over the course of the day until going to bed. TR 412. Plaintiff also stated that she would take medicine to help her sleep through the night; however, her problems would keep her awake. TR 412-413. Plaintiff then reported that she had stayed at home and had had "suicidal problem[s]"

19

for the past 6 months.  TR 410.

Upon examination by the ALJ, Plaintiff testified that she had visited Dr. Dycus once a month for depression and migraines, and had visited Dr. Howell for her back.  TR 413.  Plaintiff stated that Dr. Howell had discussed her undergoing surgery, but only if her problems worsened. TR 414.  Plaintiff reported that Dr. Howell stated that she would need to "learn to live with the pain."  *Id.*  Plaintiff then testified that she had trouble concentrating, and had hallucinations and delusions.  TR 414-415.  She explained that, on occasion, she would see "things that's not [*sic*] there and [hear] voices that's not [*sic*] there."  TR 414.  Plaintiff stated that she suffered a "constant" dull ache in her lower left back and leg.  TR 415.  Plaintiff reported that moving around eased her pain.  TR 415-416.

Upon re-examination by the ALJ, Plaintiff testified that she needed 2-3 days to recover from her migraines.  TR 424.  Plaintiff stated that her injections generally relieved her pain, but, they caused nausea and drowsiness.  *Id.*  Referring to her migraines, Plaintiff explained: "I never know when it is going to hit unless I feel that little sick sinking feeling in my stomach."  *Id.* Plaintiff testified that, after she became tired of injections, she took pills which had the same effect as the injections, but had a delayed effect.  TR 425.  When asked how many times she injected herself, Plaintiff stated that the most was 3 times in a month.  *Id.*

**4.  Testimony of Plaintiff's Husband, Kenneth Fox, on August 27, 1996**

Mr. Kenneth Fox, Plaintiff's husband, testified at the hearing.  TR 416-417.  Mr. Fox verified that Plaintiff's description of her problems and abilities was accurate based on his first-hand observations.  *Id.*

**5. Testimony of Vocational Expert, Rebecca Williams, on August 27, 1996**

Vocational expert, Ms. Rebecca Williams, also testified at Plaintiff's hearing. TR 417-426. The VE classified Plaintiff's past relevant work experience as a nurse's aide as "medium and semi-skilled"; her past relevant work at Nielson's as a frame assembler and joiner as "light to medium" and "semi-skilled"; and her past relevant work at Wendy's, At Work Personnel, and Crotty as "light and unskilled." TR 417. The VE opined that Plaintiff had acquired record-keeping skills that were transferrable at the "sedentary or light level." TR 418. The VE further opined that, in the State of Tennessee, there were approximately 600 sedentary and 400 light jobs to which Plaintiff's skills would transfer. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of the individual described by Dr. Howell (TR 207-213); that is, an individual who is "capable of lifting 10 pounds, occasionally, 10 frequently, standing and walking two hours out of eight and sitting for six hours out of eight." TR 418. The ALJ then asked the VE to identify which, if any, of Plaintiff's past relevant work the hypothetical claimant would be able to perform. *Id.* The VE answered that the hypothetical claimant would not be capable of performing any of Plaintiff's past sedentary and limited light work. *Id.* The VE qualified her answer by stating that the hypothetical individual would have "some capability for light work in regard to an individual who lifts 10 pounds on a frequent bases [*sic*], even though that work might be done sitting." *Id.* The VE further qualified her statement by stating that:

> [A]n individual that has a GED or high school diploma would - -
> there would be approximately 10,000 cashiers in the state of
> Tennessee, approximately 500 door to door salesman at sedentary
> or that are known as telemarketers. There would be approximately
> 600 sedentary jobs that are classified as interviewers. There would
> be approximately 2,500 receptionist jobs, 600 information clerk

21

jobs, 600 teacher aid jobs.

TR 419.

The ALJ then asked, "If an individual has carpal tunnel syndrome in the upper left extremities on a dominant and that has the effect of limiting the ability to engage in continuous fine fingering, gripping and grasping, with the upper left extremity, would that have an effect on past work?" TR 419. The VE answered that, "it would eliminate the work at [Crotty], that [Plaintiff] did as an edge folder," but added that "the work she did as a cleaner at Crotty's would still be available." TR 419-420. The VE opined that Plaintiff would "probably not be able to" tuck corners, but opined that the work at Wendy's, the nursing home, and At Work Personnel would remain available. TR 420.

The ALJ asked the VE whether dizziness and drowsiness as a result of medications would have an effect on the availability of Plaintiff's past work. TR 420. The VE answered that the dizziness and drowsiness would only have an effect "at Nielson's and probably [Crotty's]." *Id.* She further answered that the side-effects of Plaintiff's medications would have no effect on the sedentary jobs previously identified. TR 421. The ALJ further asked the VE:

> An individual's functioning at borderline level of intellectual functioning, but reads at high school according to Dr. Roar (Phonetic) and am [*sic*] limited in the ability to understand and remember, by the fact of IQ, the ability to, so they can do unskilled, simple one, two step operations and, and some detailed instructions and limited ability to sustain concentration and persistence, have slight limitations on social interaction [*sic*]. Would that have an effect on past work?

TR 421. The VE responded, "No." *Id.* The VE explained that someone with an I.Q. of 77 would not have problems learning the "parameters" of a certified nursing technician or the "parameters" of any of Plaintiff's past relevant work. TR 421-422.

22

The ALJ then asked the VE whether, if Plaintiff's GAF score of 45-50 was verified by objective findings, that would permit the performance of her past relevant work. TR 422. The VE answered that such a score would not permit the performance of Plaintiff's past relevant work. *Id.* After restating Dr. Dycus's findings from Exhibit 35 concerning Plaintiff's depressed mental state, the ALJ asked the VE, "if the symptoms described by Dr. [Dycus] in his report were mild, would that prohibit the performance of past work?" TR 422-423. The VE responded, "No." TR 423. The ALJ then asked the VE, "if the symptoms...were moderate to severe in May and assuming that those symptoms persisted for twelve months...would that impact past work and the other jobs that you identified?" *Id.* The VE acknowledged that moderate to severe symptoms would, in fact, impact past work. *Id.* The VE then clarified that "past work and the other jobs that [were] identified" would not be available. *Id.* The ALJ then asked:

> On Dr. Roar's report, he also indicates that the claimant would experience marked restriction and activities of daily living, moderate limitations in social functions, constant deficiencies in concentration persistence and pace, and that she would experience[], all though [*sic*], it wasn't clear, possibly one or two episodes of deterioration or decompensation. That's the B criteria from the PRTF form that Social Security Administration has developed. With such limitations, if they are supported by the objective evidence in the record, would the individual, described, be capable of performing any work?

TR 423. The VE answered "No." *Id.*

Upon re-examination by the ALJ, the VE testified that the migraines would not preclude Plaintiff from past or other work. TR 425. The ALJ then asked on "the testimony that is offered today, [if] it's supported by the objective findings, would the claimant be capable of performing any of the jobs we've discussed?" TR 426. The VE responded, "No." *Id.*

23

## B. Evidence in the 1999 Hearing

### 1. Medical Evidence: Physical

Plaintiff visited Dr. Dycus on December 12, 1996, for "congestion" and other problems. TR 310. Plaintiff returned to Dr. Dycus on August 18, 1997, for "congestion" and "cough." TR 309. Plaintiff again visited Dr. Dycus on September 2, 1997, for "congestion," "cough," and a cancer screening test. TR 306. Dr. Dycus conducted "cranium-paranasal sinuses" x-rays, which revealed normal paranasal sinuses and "no evidence of cellulitis." TR 308; 377. On September 8, 1997, Plaintiff underwent x-rays for an "injury to the left ankle." TR 376. The x-ray revealed "[s]mall plantar spurs...on the plantar aspect of the os calces...[but no] fracture or dislocation [was] evident." *Id.*

Plaintiff visited Dr. Dycus on December 16, 1997. TR 307. Plaintiff returned to Dr. Dycus on February 20, 1998, complaining of "compulsive eating behavior," among other problems. TR 306. On July 13, 1998, Plaintiff visited Dr. Dycus because of problems with her "bladder" and "discomfort." TR 304. On September 22, 1998, Plaintiff underwent a "Spine-Cervical" x-ray at Cookeville Regional Medical Center ("Cookeville"). TR 302; 375. Plaintiff's x-rays revealed "normal" results. TR 375. On September 29, 1998, Plaintiff visited Dr. Dycus for ear pain, among other problems. TR 302.

On January 8, 1999, Plaintiff underwent a "Spine-Cervical" x-ray. TR 374. Radiologist Dr. William Humphry, found a "straightening of the normal lordotic curve thought to be on the basis of muscle spasm." *Id.* On April 2, 1999, Plaintiff underwent a "Spine - Thoracic" x-ray at Cookeville. TR 373. Plaintiff's x-ray revealed "Mild degenerative arthritis thoracic spine." *Id.*

On May 21, 1999, Plaintiff visited Dr. Dycus for a "SS/disability eval." TR 331. Dr.

24

Dycus noted that Plaintiff had tenderness in her lower left spine, as well as "spasm" in her abdominal area. *Id.* Dr. Dycus further noted that Plaintiff was "able to rise and climb onto table [without] assist." *Id.*

Also on May 21, 1999, Dr. Dycus completed a "Disability Determination Section (Range of Motion)" form regarding Plaintiff. TR 332-333. Dr. Dycus noted that Plaintiff's left rotation of the cervical spine was 20 degrees less than normal, her dorsolumbar spine flexion was 5-10 degrees less than normal, her dorsolumbar spine extension was 5 degrees less than normal, her left shoulder abduction and forward elevation passive were 20 degrees less than normal, and her left shoulder passive external rotation was 30 degrees less than normal. *Id.* Dr. Dycus also noted that Plaintiff's left passive hip external rotation was 20 degrees less than normal. TR 333.

On May 27, 1999, Mr. Mark A. Loftis completed a consultative psychological examination, which revealed that Plaintiff was taking the following medications: "Effexor, Celebrex, Soma, Skelaxin, Ambien, Baclofen, Premarin, Imitrex nasal inhaler, Detrol, [and] Estratest h.s." TR 340-341. Mr. Loftis noted:

> The claimant reports she gets up each morning at various times. She reports she is up from 6:00 to 11:00 a.m. She reports she is up six or seven times throughout the night because of her back. She retires each evening any where [*sic*] from 10:00 p.m. to 4:30 a.m. She reports that she is very limited in what she does. Her daughter helps her quite a bit with household chores but occasionally she does wash a few dishes or may try to vacuum for about ten minutes or so. She reports that she and her husband share the responsibility of paying the bills. She reports that her husband and daughter help her with the cooking as well as laundry. The claimant reports that she is doubtful that she could live independently without assistance because of her medical problems. She indicates that she is independent in her personal hygiene needs.

TR. 342.

Case 2:03-cv-00082   Document 11   Filed 04/17/06   Page 25 of 53 PageID #: 25

On June 8, 1999, Dr. Dycus completed an "Assessment of Functional Capacities" form for Plaintiff.  TR 337-339.  Dr. Dycus opined that Plaintiff had no evidence of limitation in her cognitive, communicative, or motor development.  TR 337.  Dr. Dycus further opined that Plaintiff's social ability was "impaired as follows: moderate impairment of social interaction." TR 338.  Dr. Dycus noted that Plaintiff's personal/behavioral patterns were "impaired as follows: [e]xacerbations of [d]epression likely to be [r]epeated with work environment."  *Id.*  Dr. Dycus opined that Plaintiff's had "mild impairment of [c]oncentration and task completion."  *Id.*  Dr Dycus noted that Plaintiff had no evidence of limitation on responsiveness to stimuli.  *Id.*

On June 8, 1999, Dr. Dycus completed a "Medical Source Statement of Ability to do Work-Related Activities" form of Plaintiff.  TR 334-336.  Dr. Dycus noted that Plaintiff's "lifting/carrying [abilities were] affected by impairment[s]."  TR 334.  Dr. Dycus further explained that Plaintiff suffered from "[p]ain [in her] lower [b]ack"; "[s]pasm [in her] lower [b]ack"; "[l]imited ROM [in her] back"; "[t]enderness [in her] [b]ack"; and "Radiculitis from [n]erve irritation in [her] lower back."  *Id.*

On September 7, 1999, Plaintiff completed an "Information For Use At Social Security Hearings" form, which confirmed and added to Mr. Loftis' description of her medications.  TR 384.  Plaintiff listed "Soma 350mg, Effexor 150mg, Celebrex 200mg, [A]mbien 10mg, Premarin 1.25, Trazadone 50mg, Det Rol 2mg, Extratest H.S. 1.25mg, Imitrex Injections, Baclofen 10mg, Duradrin Caps, Imitrex Pill, [and] Imitrex Nasal Spray."  *Id.*

**2.  Medical Evidence: Mental**

On December 16, 1997, Dr. Dycus administered a Beck Depression Inventory (BDI) test to assess Plaintiff's mental state "during the past 2 weeks, including today."  TR 307.  Plaintiff

26

scored 18 out of a possible 21; however, Dr. Dycus did not note the implications of such a score

on his medical report. *Id.* On February 20, 1998, Dr. Dycus administered another BDI, and noted

that Plaintiff scored 17 out of 21, which fell within the "10-21 severe" range. TR 305-306. On

July 13, 1998, Dr. Dycus administered a third BDI. TR 303-304. Plaintiff scored 11 out of 21,

and Dr. Dycus noted that Plaintiff's score fell within the "10-21 severe" range. *Id.*

On November 5, 1998, Dr. Dycus completed a "Clinical Assessment of Ability to do

Work-Related Activities (Mental)" form of Plaintiff. TR 299-301. Dr. Dycus concluded that

Plaintiff was not significantly limited in her "ability to understand and remember," and to "sustain

concentration and persistence." TR 299. Additionally, Dr. Dycus noted that Plaintiff had

"limited...social interaction," and that her ability to adapt was not significantly limited. TR 300.

Dr. Dycus elaborated on Plaintiff's social interaction, noting:

> Patient currently suffering from emotional lability and agitation
> due to underlying depression. Response to criticism even
> constructively or correction would likely result in or evoke a
> response of hostility/agitation or labiltiy and crying.

TR 300.

Commenting on Plaintiff's overall mental condition and abilities, Dr. Dycus opined:

> [Plaintiff] possess[ed] a mild degree of anhedonia which affects
> initiative and independent activity that is self-motivating in nature.
> This as well as other symptoms and impairments listed above of
> one [*sic*] mild in severity. They were severe to moderate in
> severity in May of 2 yrs. ago but seem to be improving on an
> altered regimen of anti-depressant.

TR 300. Dr. Dycus further opined that Plaintiff had "slight" restrictions of activities of daily

living, "moderate" difficulties in maintaining social functioning, "seldom" had deficiencies of

concentration, persistence or pace, and had "repeated*(3+)" episodes of deterioration or

decompensation in work or work-like settings. TR 301.

On May 21, 1999, Dr. Dycus completed a "Medical Source Statement of Ability to Do Work-Related Activities" form regarding Plaintiff. TR 334-336. Dr. Dycus reported that Plaintiff had "[m]oderate limitation on [s]ocial interaction with repeated episodes of deterioration or decompensation in depressive symptoms, concentration and withdrawal from work environment." TR 336. He further reported that Plaintiff was "being treated for moderate to [s]evere [d]epression...as evidenced by... [d]ependency and objective scoring on [BDI]." *Id.*

On May 27, 1999, Mr. Loftis performed a consultative examination of Plaintiff. TR 340-345. Mr. Loftis conducted a Wechsler Adult Intelligence Scale, Wide Range Achievement Test, Bender Visual-Motor Gestalt Test, and Rorschach Inkblot Test. TR 342. Regarding the Wechsler Adult Intelligence Scale, Mr. Loftis noted:

> The claimant's Full Scale IQ of 85 places her in the Low-Average classification regarding cognitive functioning...The claimant had better developed verbal comprehension abilities than her working memory and verbal comprehension is better than processing speed as well. The claimant demonstrated a significant strength in the area of Vocabulary on the Verbal subtests while demonstrating a relative weakness in the area of Arithmetic.

TR 343.

Regarding the Wide Range Achievement Test, Mr. Loftis stated:

> [C]laimant is literate. Her reading ability is significantly better than her obtained IQ on the WAIS-III. Her standard score on arithmetic was consistent with her Verbal abilities as determined by the WAIS-III.

TR 343. The Bender Visual-Motor Gestalt Test showed "no clinical indications of organicity or perceptual motor difficulties." *Id.*

The Rorschach Inkblot Test revealed:

28

> [T]he claimant produced percepts on all cards...[t]he percepts did not demonstrate any evidence of delusional thinking. She was reality oriented in her responses. There were no bizarre or unusual responses. Her responses were consistent with her obtained IQ.

TR 344.

Mr. Loftis noted that there "was [no] evidence of suicidal or homicidal thought." TR 344.

He further observed: "There were no abnormalities noted in the language. Thought content and processes were logical and coherent. Her mood was dysphoric." *Id.* Mr. Loftis reported:

> On the day of the evaluation, the claimant could understand the questions, remember historical information appropriately. She maintained good social interaction on the day of the evaluation. Concentration was good and persistence at tasks was quite good. Her ability to tolerate stress associated with day-to-day activities was moderately limited due to her depressive disorder.

TR 344. Mr. Loftis concluded:

> The claimant alleges many medical problems which she reports that have made her unable to work such as her back problems and carpal tunnel disorder. She reports that she is under a doctor's care and takes quite a bit of medication. She indicates that she was doubtful that anyone would hire her knowing her history of back problems and all the medication she has to take. From a cognitive perspective, there do not appear to be significant limitations that would render her unable to work. Simple or even multi-level two and three-level tasks should be able to performed [sic] by this claimant. Her literacy is adequate for employment. Her emotional control may be affected by her depressive disorder and she may have some difficulty functioning in a stressful environment.

TR 345.

On June 3, 1999, Mr. Loftis completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form regarding Plaintiff. TR 346-348. With regard to Plaintiff's abilities to "mak[e] occupational adjustment[s]," Mr. Loftis checked "good" in all categories except Plaintiff's ability to deal with work stresses, which he rated as "fair." TR 346.

With regard to Plaintiff's abilities to "mak[e] performance adjustments," Mr. Loftis checked "good" in all categories except Plaintiff's ability to understand, remember and carry out complex job instructions, which he rated as "fair." TR 347. With regard to Plaintiff's abilities to "mak[e] personal-social adjustments," Mr. Loftis checked "good" in all categories except Plaintiff's abilities to behave in an emotionally stable manner and to relate predictably in social situations, which he rated as "fair." *Id.*

On June 8, 1999, Dr. Dycus completed an "Assessment of Functional Capabilities" form regarding Plaintiff. TR 337-339. Dr. Dycus stated that Plaintiff's "[d]epression" was a "medically determinable impairment." TR 337. Dr. Dycus elaborated that Plaintiff had "moderate impairment of social interaction," "[e]xacerbations of [d]epression likely to be [r]epeated with work environment," and "mild impairment of [c]oncentration [and] task completion." TR 338.

### 3. Deposition of Dr. Dycus on April 28, 1999

Dr. Dycus was deposed by Plaintiff's attorney, Mr. John Allen, on April 28, 1999. TR 357-370. Dr. Dycus testified that Plaintiff had first visited him for a work-related injury in 1992. TR 358. Dr. Dycus reported finding "symptoms and signs of tendonitis, epicondylitis and carpal tunnel syndrome." *Id.* Dr. Dycus testified that Plaintiff had suffered "soft tissue injuries, [and] connective tissue injuries." TR 359. Dr. Dycus agreed with Mr. Allen that such injuries could "be very painful at times." *Id.*

Dr. Dycus testified that he had treated Plaintiff "in a general sense" since 1992. TR 359. Dr. Dycus confirmed Dr. Howell's belief that Plaintiff had "lumbar radiculopathy." *Id.* Dr. Dycus described lumbar radiculopathy as "when the lumbar spine creates irritation or

compression of the nerve roots in the lower back in such a way that it affects or compromises neurologic function." TR 360.

Mr. Allen asked Dr. Dycus if he thought that Plaintiff had "degenerative disc disease." TR 360. Dr. Dycus answered, "Yes, she does." *Id.* Dr. Dycus testified that Plaintiff had arthritis "in the thoracic region of her spine [and]...no specific appearance of arthritic changes in the lumbar spine, but there [was] degenerative disc disease or soft tissue disease." TR 361. Dr. Dycus further testified that Plaintiff's subjective complaints of pain had been consistent with the medical records and findings of facts. *Id.* Dr. Dycus stated that the pain which had radiated from Plaintiff's lumbar area into her leg and hip was "likely [caused by] irritation of the nerve roots in her lower spine." *Id.*

Dr. Dycus testified that Plaintiff had also suffered from muscle spasms and significant limitations of motion. TR 361. Regarding the effects of Plaintiff's medications, Dr. Dycus testified that the "analgesics that are scheduled have narcotic effects, and the antispasmodics certainly could create a dulling of mental acuity and drowsiness or somnolence that could affect, depending on what machinery was going to be worked with, that could present some restrictions." TR 362. Dr. Dycus added that "simple one-step tasks" would not be restricted "in a significant way." *Id.* Dr. Dycus stated that Plaintiff's medical condition had resulted in "disabling pain," given that "disabling" was defined as "partial or total disability." TR 363. Dr. Dycus then stated that Plaintiff's complaints of pain over the past several years were "disabling." *Id.*

Dr. Dycus testified that Plaintiff's "disabling" pain would allow her to sit for "one-third to two-thirds of an eight-hour day." TR 363-364. Dr. Dycus stated that Plaintiff would have no restrictions on her ability to stand. TR 364. When asked by Mr. Allen if her condition would

31

restrict her ability to lift, Dr. Dycus reported that "lifting present[ed] some restrictions, and that would be - - best recommended to be 10 pounds on a frequent basis and anywhere between 10 and 15 pounds on an occasional basis." *Id.* Dr. Dycus then testified that Plaintiff's "carpal tunnel or any injury to her arm or hand" presented no disabling limitations. *Id.*

When asked if he agreed with Dr. Rohr's techniques, Dr. Dycus answered, "Yes." TR 365. Dr. Dycus testified that he had used the BDI to evaluate Plaintiff. *Id.* Dr. Dycus stated that Plaintiff's mental condition would "get better at a time then it'll go back to being severe." TR 365-366. Dr. Dycus reported that he had prescribed Effexor for Plaintiff's depression, and Prozac for a short period.[13] TR 366-367. Dr. Dycus testified that he had prescribed Remeron, which was an antidepressant. TR 367. Dr. Dycus stated that Plaintiff had reacted beneficially to the Remeron at first, "but then [became] refractory after a certain period of time." *Id.* Dr. Dycus reported that he had prescribed Paxil, to which Plaintiff had reacted beneficially at first "and then refractory." *Id.*

When Mr. Allen asked if Plaintiff had "gone back to a severe case of depression," Dr Dycus answered, "That's correct." *Id.* Dr. Dycus stated that Plaintiff's mental condition would not limit her "ability to understand or remember ... to sustain concentration and persistence, to make simple, work-related decisions [and] to sustain routine work in coordination with and/or in a proximity to others without being distracted from them." TR 367-368. Dr. Dycus testified that Plaintiff's mental condition would "be exacerbated with interaction," and further qualified that Plaintiff's social interaction was "moderately limited." TR 368.

Dr. Dycus stated that Plaintiff had "slight" functional limitation[s], "moderate" difficulties

---

[13] Prozac was found to be effective until Plaintiff became refractory to it. TR 367.

in maintaining social functions, and "seldom" had difficulties with concentration, persistence or pace. TR 368-369. Dr. Dycus testified that Plaintiff had "repeated" episodes of deterioration or decompensation in work or work-like settings. TR 369. Dr. Dycus reported that Plaintiff's "depression [had] not reacted favorably to treatment or medication." TR 370.

### 4. Plaintiff's Testimony on September 7, 1999

Plaintiff essentially reiterated a portion of her previous testimony and added the following. TR 431-432.

Upon re-examination, Plaintiff testified that she had not worked since 1995. TR 434. When asked about her appetite, Plaintiff answered that it "varies from day to day." *Id.* She stated, "Some days I don't care if I eat at all and other days I'll want to eat all day long. I've gained excessive weight from different antidepressants." *Id.* Plaintiff testified that the medicine made her "extremely sleepy and...[would give her a] rapid heartbeat." *Id.* Plaintiff also stated that her medication would make her "break out and get rashes." *Id.*

Plaintiff testified that she had pain in her back, left side, down her left leg, up around her left chest, and left breast. TR 435. Plaintiff testified that after taking Soma, she would "lay down until it takes effect and then I'll get up and try to do a little something, but it just bothers me." *Id.* Plaintiff stated that if she stood for any longer than 45 minutes, her leg would go numb and she would start to fall down. *Id.* Plaintiff reported that she would "sleep a lot during the day," and would "wake up several times during the night." TR 435-436. Plaintiff further testified that she did not tolerate her grandchildren very well. TR 436.

### 5. Testimony of Vocational Expert, Rebecca Williams, on September 7, 1999

The VE essentially reiterated her previous testimony and added the following upon re-

examination by the ALJ. TR 432-433; 436-447.

When asked by the ALJ if the ability to lift 10 pounds occasionally and 10 pounds frequently, to stand and walk at least 2 hours out of 8, and to sit for 6 hours out of 8 was consistent with the sedentary jobs she previously identified, the VE answered, "Yes." TR 440. When asked whether the answers provided by Dr. Dycus in his deposition (TR 367-369) would "permit performance of the jobs identified," the VE answered, "Yes." TR 440-441.

The VE reported that Plaintiff's "fair ability to deal with stress in the workplace, understand and remember and carry out complex job instructions, behave in an emotionally stable manner, and relate predictably in social situations" would not preclude Plaintiff from unskilled or semiskilled jobs. TR 441. The ALJ then stated:

> Dr. [Dycus] indicates ability to lift 15 pounds occasionally, ten frequently. No limitation on standing or walking. No limitation on sitting. Occasional climbing and crawling. No manipulative limitations, no environmental limitations...a moderate limitation on social interaction with repeated episodes of deterioration and decompensation and depressive syndromes. Concentration, withdrawal from work environment. Patient being treated for moderate to severe depression...no evidence of limitation in cognitive malfunction or communicative development or motor development. Social ability was moderately impaired. Personal behavioral patterns were impaired by exacerbation of depression likely to be repeated in work environment. Mild impairment of concentration and task completion. Do those limitations generally permit the performance of the sedentary jobs you identified?

TR 441-442. The VE answered, "Yes." TR 442.

The VE stated that record-keeping jobs would be appropriate for someone with a low average intellectual functioning, someone who read at a post high-school level, and someone who required a sedentary job with limitations on social interaction. TR 443. Regarding bookkeeping jobs, the VE opined that there were approximately "6,000 of those jobs in the State economy" of

34

Tennessee. *Id.* The VE further testified that at the sedentary level in Tennessee, there were 4,000 assembler jobs, 700 inspector jobs, and approximately 1,000 to 1,100 general labor jobs. *Id.*

The ALJ then asked the VE: "How about light jobs not requiring lifting in excess of ten pounds occasionally or ten frequently." *Id.* The VE opined that in the State of Tennessee, there were approximately 12,000 machine operator positions, 7,000 assembler positions, 1,200 light level inspector positions, and 2,000 janitor positions. TR 443-444.

Upon examination by Plaintiff's attorney, the VE testified that the 6,000 auditing positions available in Tennessee may be "compromised" by someone possessing a sixth grade arithmetic level. TR 444. The VE further testified that the jobs previously mentioned might be "compromised" by "problems with drowsiness and mental acuity." TR 447. The VE also stated that if Plaintiff was "required to lay down during the normal work day," the aforementioned jobs would "not...be appropriate." *Id.*

## C. Evidence in the February 6, 2003 Hearing

### 1. Medical Evidence: Physical

On October 14, 2002, Dr. David Gaw, an orthopedic surgeon, examined Plaintiff. TR 539-540. Dr. Gaw performed a neurological examination, and diagnosed Plaintiff with "[c]hronic pain syndrome, [and] degenerative lumbar disc disease." *Id.* Dr. Gaw noted that Plaintiff took "Premarin, Ditropan, Trico, Lipitor, Vioxx, alprazolam, hydrocodone p.r.n., Soma p.r.n., triamterene/HCTZ, Imitrex tablets, Zyrtec, Rhinocort nasal spray, and multivitamins." TR 540. Dr. Gaw noted:

> [Plaintiff] appear[ed] to be quite depressed, but walk[ed] without a
> limp, but does have slow hesitant movement. To look at her back,
> she has the normal curvature spine. [Stood] without a list of
> scoliosis. Pelvis [was] level. Large soreness and tenderness across

35

> the lower back , [*sic*] but no muscle spasm.  Flexes 60 degrees,
> extends 20.  Straight-leg raises up to 80 degrees.  Neurological
> exam [was] normal in the lower extremities. [G]ood movement of
> the joints of the lower extremities.

TR 540.

On October 14, 2002, Dr. Gaw completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form regarding Plaintiff.  TR 541-544.  Dr. Gaw opined that Plaintiff's lifting and carrying were affected by her impairment.  TR 541.  Dr. Gaw further opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently carry less than 10 pounds, and stand and/or walk for at least 2 hours in an 8-hour workday.  *Id.*  Dr. Gaw noted that Plaintiff's sitting, pushing, and/or pulling abilities were not affected by her impairment.  TR 542. Dr. Gaw reported that Plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop. *Id.*  Dr. Gaw also noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  TR 543.

## 2.  Medical Evidence: Mental

On October 7, 2002, at the SSA's request, Mr. Stephen Hardison conducted a Clinical Interview of Plaintiff and administered the Wechsler Adult Intelligence Scale Test, Wide Range Achievement Test, Bender Visual-Motor Gestalt Test, and Rorschach Inkblot Test.  TR 531-536. Mr. Hardison's Diagnostic Impression stated:

> [Plaintiff] presented with some mixed symptomology of anxiety
> and depression.  By her description, [she] does not appear to meet
> the criteria for a specific disorder, and thus anxiety NOS is given.
> She did not present with significant cognitive limitations.

TR 535.

Mr. Hardison concluded in the Functional Assessment and Vocational Implications

36

section as follows:

> [Plaintiff] had the capability to understand and remember very
> basic instructions adequately. Her immediate concentration and
> attention skills appeared somewhat limited. Her social interaction
> skills appear adversely affected by her emotional status. She
> presented as rather agitated and with a cynical attitude. Her ability
> to maintain emotional stability on a persistent basis seemed rather
> limited, particularly in a highly stressful situation, one involving a
> great deal of close interaction with others. She should be capable
> of taking appropriate precautions against normal hazards and can
> travel independently. She appears to function within the low-
> average range intellectually and should be capable of learning a
> variety of basic instruction job tasks. This claimant could be a
> candidate for vocational rehabilitation services. The degree of
> disability based on medical issues will need assessing by a
> physician.

TR 535.

Also on October 7, 2002, Mr. Hardison completed a "Medical Source Statement of Ability

to do Work-Related Activities (Mental)" form of Plaintiff. TR 537-538. Mr. Hardison opined

that Plaintiff's ability to understand, remember, and carry out instructions were affected by her

impairment. TR 537. Mr. Hardison opined that Plaintiff was "slight[ly]" restricted in her ability

to understand and remember detailed instructions, carry out detailed instructions, and make

judgments on simple work-related decisions. *Id.* Mr. Hardison further opined that Plaintiff was

"slight[ly]" to "moderate[ly]" restricted in her ability to interact appropriately with supervisors.

TR 538. Mr. Hardison reported that Plaintiff was "slight[ly]" restricted in her ability to respond

appropriately to changes in routine work settings, "moderate[ly]" restricted in her ability to

interact appropriately with the public and co-workers, and "moderate[ly]" restricted in her ability

to respond appropriately to work pressures in a usual work setting. *Id.*

37

### 3.  Plaintiff's Testimony on February 6, 2003

Plaintiff reiterated portions of her previous testimony from the 1996 and 1999 hearings, and added the following.

Plaintiff testified that, "depending on the weight of the person," she had lifted 100 pounds or more while working as a nurse's aide.  TR 479.  Plaintiff stated that, during her 3 years at Nielson's, she would pick up boxes weighing 40 to 50 pounds.  TR 480.  Plaintiff then reiterated previous testimony concerning her work at Crotty's.  TR 481.  Plaintiff testified that her main problems were her "back[,] depression[, and] the medicine."  *Id.*  Plaintiff stated that she would get "very irritable," and "preferr[ed] staying home."  TR 482.

Plaintiff testified that people would "make [her] suspicious...like they want to hurt [her]."  TR 482.  Plaintiff denied, however, having any "suicidal thoughts" that she would act upon because her "granddaughters hold [her] down."  TR 483.  Plaintiff stated that she had thoughts of hurting others, but would never act on them because "then I would be taken away from my family."  *Id.*  Plaintiff testified that her medications made her "very sleepy and tired."  TR 483-484.

Upon examination by the ALJ, Plaintiff testified that she possessed a driver's license, but rarely drove.  TR 485.  Plaintiff stated that she had never supervised or led others in the workplace.  TR 486-487.  Plaintiff reported that she had physical therapy on her back "shortly after June of 1994."  TR 487.  Plaintiff then stated that she had a "TENS unit" for the fractured tail bone she suffered while working at Wendy's.  *Id.*  Plaintiff added that she was unable to see a psychiatrist because she "couldn't afford it."  TR 488.  Plaintiff also stated that she could stand for "about 30 minutes" before she would have to sit down.  TR 489.  Plaintiff then testified that

she had a bladder problem, and that she recently had surgery for it. *Id.* Plaintiff stated that she could sit for "[m]aybe 30 minutes" at a time. TR 489-490.

Plaintiff testified that she did not sleep well, and that her sleep was "very erratic." TR 490. Plaintiff stated that she prepared meals, washed dishes, "sporadically cleaned the house," and did laundry. TR 490-492. Plaintiff testified that she watched television "a little bit" and "read some." TR 492. When asked what a typical day was like, she replied:

> It depends on what sleep I got. I'll wake up 11:00, 11:30 unless I
> have a doctor's appointment that I have to be to. Then I will get
> up and, you know - - if it's here in town, I will take myself and
> then I go home. I have to go to Nashville twice a month for
> allergy shots and I'll get a hold of my daughter and she takes me
> for those. But, I get up. I'll sit around for 30 minutes, get up, give
> my dog a little water and some food, and take care of my dog out
> [*sic*]. So, I give him some food and water. I'll come in - - just - -
> my days are just boring to a lot of people.

TR 492-493. Plaintiff added that after she would take care of her dog, she would "write a couple of letters, grab a book, [and] read a little bit on it [*sic*]." TR 493. Plaintiff testified that her problems bending over had affected her ability to get dressed, and that the weather had caused her to have sinus headaches. TR 493-494. Plaintiff stated that, compared to the previous February, she felt "worse." TR 494. Plaintiff explained that she was "just losing all desire to do a lot of stuff." *Id.* Plaintiff testified that she smoked a "pack and a half a day," but rarely consumed alcohol, never drank coffee, and had an occasional coke. TR 494-496.

**4. Testimony of Vocational Expert, Kenneth Anchor, on February 6, 2003**

Vocational expert, Dr. Kenneth Anchor, also testified at the hearing. TR 496-501. The VE classified Plaintiff's "salad bar attendant job...[as] light unskilled work," and her factory job as "medium exertion unskilled work." TR 496-498.

39

The ALJ presented the VE with a hypothetical individual restricted to the "sedentary unskilled...[and] low-level semiskilled jobs that the Commissioner has identified." TR 498. The ALJ then asked the VE to identify "jobs in the state and the nation that such a person with these limitations could perform." *Id.* The VE answered that there would be jobs "at both light and sedentary levels." *Id.* The VE added that examples included "small product packer, the job of sorter, the job of assembler, the job of table worker, and the job of pricing clerk." *Id.*

The ALJ then asked the VE how many jobs were available in various categories in the State of Tennessee and in the nation. TR 498-499. The VE answered that, in the State of Tennessee, there "would be in excess of 23,000 such jobs, and 50 times that number nationwide." *Id.* The ALJ then asked how a "ten-pound lifting limit" would affect the salad bar job at Wendy's and the jobs the VE had previously identified as appropriate. TR 499. The VE testified that the salad bar job would be affected, the packer job would be eliminated, and, in the State of Tennessee, the number of jobs available would decrease from 23,000 to 18,000. *Id.* The VE opined that if "the difficulties that were described during testimony are at the severe level, if they're extreme, chronic, and tractable problems unmanageable [*sic*], unresponsive to medication or other forms of treatment, I believe any type of full-time gainful activity in a conventional work setting would be problematic." *Id.*

Upon examination by Plaintiff's attorney, the VE testified that deficiencies of concentration, persistence, pace, and "marked restrictions of daily living" would be a "serious impediment" to work. TR 500-501.

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

Case 2:03-cv-00082   Document 11   Filed 04/17/06   Page 41 of 53 PageID #: 41

In reviewing the decisions of the Commissioner, courts look to four types of evidence:  (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

42

"listed" impairments[14] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[14]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by (1) finding that Plaintiff's mental impairments had not met or equaled Listing12.04; (2) finding that Plaintiff's orthopedic impairments had not met or equaled Listing 1.05c; and (3) not fully crediting Plaintiff's subjective complaints of pain. Docket Entry No. 5. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

44

**1. Listing 12.04**

Plaintiff argues that the ALJ erred by finding that Plaintiff's mental impairments did not

meet or equal Listing 12.04 of the Medical-Vocational Guidelines. Docket Entry No. 5. In

particular, Plaintiff argues that the ALJ erred by not granting controlling weight to the findings of

Drs. Rohr and Dycus. *Id.*

Listing 12.04, which relates to affective disorders, provides that the required level of

severity is met when there is a medically documented depressive syndrome (characterized by at

least four specific symptoms), resulting in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Pt. 404, Subpt. P, App. 1.[15]

Plaintiff essentially implies that had the ALJ given sufficient weight to the findings of Dr.

Rohr and/or Dr. Dycus, the ALJ would have found Plaintiff disabled pursuant to Listing 12.04.

*Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in

---

[15]Additionally, a claimant may satisfy Listing 12.04 if he or she demonstrates a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and one of three possible additional criteria. 20 C.F.R., Pt. 404, Subpt. P, App. 1. Plaintiff does not argue disability under this provision, however.

deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

46

The opinion of a consulting physician is not entitled to the deference due the opinion of a treating physician. *Barker v. Shalala*, 40 F. 3d 789, 794 (6th Cir. 1994). Dr. Rohr, a consulting psychologist, assessed Plaintiff only once, in October 1995. TR 214-223. Dr. Rohr stated in his October 1995 assessment of Plaintiff that she had marked restrictions of activities of daily living, and constant deficiencies of concentration, persistence, and pace. TR 223.

Dr. Dycus treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his evaluation than to others. TR 185-206; 260-262; 264-272; 299-310; 331-339. Dr. Dycus, however, testified in his 1999 deposition that Plaintiff's restrictions of activities of daily living were "slight," her difficulties in maintaining social function were "moderate," and that she "seldom" had difficulties of concentration, persistence, or pace. TR 368. When the opinions of physicians are inconsistent, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. *See, e.g.*, 20 C.F.R. § 416.927(e)(2).

Dr. Rohr's October 1995 report was completed prior to Plaintiff's receiving any psychiatric treatment. *See* TR 216. Subsequent medical records indicate that although Plaintiff's mental condition essentially "waxed and waned," it generally improved once she began receiving treatment and medication. Moreover, subsequent medical records demonstrate that Plaintiff's functional limitations were not as severe as indicated by Dr. Rohr in his 1995 assessment. *See, e.g.,* April 1999 deposition of Dr. Dycus (TR 357-370); May 1999 consultative examination report of Mr. Loftis (TR 340-345); June 1999 Medical Source Statement of Abilities to Do Work-Related Activities (Mental) form (TR 346-348); October 2002 evaluation by Mr. Hardison (TR 531-536).

Because Dr. Rohr's 1995 assessment is inconsistent with other opinions and evidence in the record, the Regulations do not mandate that the ALJ accord Dr. Rohr's opinion controlling weight. Accordingly, Plaintiff's argument fails.

Furthermore, the ALJ's determination that Plaintiff's mental impairments did not meet Listing 12.04 was supported by substantial evidence. As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." Additionally, the ALJ's decision demonstrates that he carefully considered the hearing testimony. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff's mental impairments did not meet or equal Listing 12.04.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

48

## 2.  Listing 1.05c

Plaintiff further contends that the ALJ erred in finding that Plaintiff's orthopedic impairments did not meet or equal Listing 1.05c.[16]  Docket Entry No. 5.  Specifically, Plaintiff contends that her degenerative disc disease and lumbar radiculopathy satisfy the requirements of this listing.  *Id.*

Listing 1.05c requires Plaintiff to demonstrate that, (1) she has a vertebrogenic disorder, and, (2) that she has pain, muscle spasm, and significant limitation of motion in the spine, as well as appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss, and that those conditions have persisted for a minimum of 3 months and are expected to last for a minimum of 12 months despite prescribed therapy.

In the case at bar, Drs. Howell, Stuber, Dycus, and Gaw each reported that Plaintiff's sensory and motor functioning were normal.  *See, e.g.,* TR 184; 213; 196; 201; 203; 331; 540.  Accordingly, "substantial evidence" exists to support the ALJ's determination that Plaintiff's orthopedic impairments did not qualify for disability under the Social Security Act.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner*, 745 F.2d at 387.  The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

---

[16]Listing 1.05c, as discussed herein, refers to that Listing as it existed at times relevant to Plaintiff's action.  That section is not contained in the current edition of the Code of Federal Regulations.  The listing dealing with disorders of the spine is now numbered 1.04, and is worded differently than Listing 1.05c.  Listing 1.05c is quoted in Defendant's brief.  *Compare* 20 C.F.R., Pt. 404, Subpt. P, App. 1 with Docket Entry No. 8.  *See also* Docket Entry No. 5, pp. 13-14.

## 3.  Subjective Complaints of Pain

Plaintiff also maintains that the ALJ erred in finding that her subjective complaints of pain were not fully credible.  Docket Entry No. 5.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the

50

precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that the objective medical evidence did not correlate with Plaintiff's subjective complaints. TR 466. Specifically, the ALJ stated: "Given such numerous inconsistencies, contradictions, and other circumstances, the claimant's credibility is poor." *Id.* The ALJ's decision in its entirety specifically addresses in great detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, indicating that these factors were considered. TR 459-468. It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's

Case 2:03-cv-00082   Document 11   Filed 04/17/06   Page 51 of 53 PageID #: 51

demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing all of the medical and testimonial evidence, the ALJ determined that Plaintiff's testimony could not be found fully credible. TR 469. The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a

waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 2:03-cv-00082   Document 11   Filed 04/17/06   Page 53 of 53 PageID #: 53